Slip Op. 13-9

UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Nicholas Tsoucalas, Senior Judge**

| | |
|---|---|
| US MAGNESIUM LLC,                         : | |
|          Plaintiff,        : | |
|    v.                        : | Court No.: 12-00006 |
| UNITED STATES,                          : | PUBLIC VERSION |
|        Defendant,        : | |
|        and             : | |
| TIANJIN MAGNESIUM                       : | |
| INTERNATIONAL CO., LTD.,                 : | |
|       Defendant-Intervenor.   : | |

OPINION and ORDER

**Held:** Plaintiff's motion is granted in part so that Commerce may reconsider its decision not to extend the deadline for USM's untimely submission as well as the surrogate values for labor, financial ratios, and truck freight rates. Plaintiff's motion is denied with regard to TMI's U.S. expenses. The court defers judgment on the issue of retort classification so that Commerce may reconsider its determination following its analysis of the untimely submission on remand.

Dated: January 22, 2013

King & Spalding LLP, (Stephen A. Jones and Jeffery B. Denning) for US Magnesium LLC, Plaintiff.

Stuart F. Delery, Acting Assistant Attorney General; Jeanne E. Davidson, Director, Claudia Burke, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Renee Gerber and Ryan M. Majerus); Office of the Chief Counsel for Import Administration, United States Department of Commerce, Melissa M. Brewer, Of Counsel, for the United States, Defendant.

Riggle & Craven, (David A. Riggle, Saichang Xu, and David J.

Craven) for Tianjin Magnesium International Co., Ltd., Defendant-Intervenor.

**TSOUCALAS, Senior Judge:** Plaintiff US Magnesium LLC ("USM") moves for judgment on the agency record challenging the determination by the Department of Commerce, International Trade Administration ("Commerce") in <u>Pure Magnesium From the People's Republic of China: Final Results of the 2009-2010 Antidumping Duty Administrative Review of the Antidumping Duty Order</u>, 76 Fed. Reg. 76,945 (Dec. 9, 2011) I.A. Access Public Rec. 31 ("<u>Final Results</u>").[1] Commerce and defendant-intervenor Tianjin Magnesium International Co., Ltd. ("TMI") oppose USM's motion.

**Background**

The administrative review at issue concerns pure magnesium TMI imported from the People's Republic of China ("PRC") during the period of review ("POR") beginning May 1, 2009 and ending April 30, 2010. <u>See</u> <u>id.</u> at 76,945. TMI imports pure magnesium supplied by a sole producer, [[

]]. P.R. 13 at 11. [[          ]] produces pure magnesium via the "Pidgeon" process. Under the "Pidgeon" process, the producer first treats magnesium-bearing dolomite in a kiln to produce calcined dolomite. The producer then mixes the calcined

---

[1]     Hereinafter all documents in the public record will be designated "P.R." and all documents in the confidential record designated "C.R." without further specification except where relevant. Additionally, the abbreviation "I.A." will refer to portions of the confidential and public records filed in Commerce's electronic filing system, I.A. Access.

dolomite with ferrosilicon and fluorite power and presses the
mixture into balls or briquettes.  In order to purify the magnesium
— chemically and physically separate it from the other inputs — the
producer places the pressed mixture into retorts, which are "steel
tubes placed under a vacuum in a furnace."  Def.'s Opp. Pl.'s Mot.
J. Agency R. at 5 ("Def.'s Br.").  The high heat from the furnace
vaporizes the magnesium, which travels through the retort and then
"condense[s] into a highly purified form."  Id. at 5; See Pure
Magnesium from the PRC: Issues and Decision Memorandum for the
Final Results of the 2009–2010 Administrative Review at 7 n.39,
Inv. No. A-570-832 (Dec. 5, 2011) ("I&D Memo").  TMI reported that
[[          ]] rented retorts during the POR.  See P.R. 45 at 7.

      TMI also reported that Mr. James Gammons performed certain
"ministerial activities" in the U.S. on behalf of TMI.  P.R. 61 at
3.  The "activities" focused on [[

      ]]."  Id.  TMI claimed that "Mr. Gammons was not a sales agent
for TMI" and that he did not take possession of subject merchandise
in the U.S. prior to sales to U.S. customers.   Id.

      During the review, Commerce used its nonmarket economy[2]

---

      [2] "The term 'nonmarket economy country' means any foreign
country that the administering authority determines does not
operate on market principles of cost or pricing structures, so that
sales of merchandise in such country do not reflect the fair value
of the merchandise."  Section 771(18) of the Tariff Act of 1930, as
amended, 19 U.S.C. § 1677(18) (2006).  All further citations to the
Tariff Act of 1930 are to the relevant provisions of Title 19 of
the U.S. Code, 2006 edition.

("NME") methodology to construct the normal value[3] ("NV"), <u>Pure</u>

<u>Magnesium from the PRC: Preliminary Results of the 2009-2010</u>

<u>Antidumping Duty Administrative Review</u>, 76 Fed. Reg. 33,194, 33,195

(June 8, 2011) ("<u>Preliminary Results</u>"), using surrogate data to

value the factors of production ("FOP").   <u>See</u> 19 U.S.C. §

1677b(c)(1).   Commerce selected India as the surrogate country and

used Indian data to value TMI's FOP.   <u>Preliminary Results</u>, 76 Fed.

Reg. at 33,195.   Commerce classified retorts as an indirect

material rather than as a direct material, treating them as factory

overhead in the FOP calculation.   P.R. 64 at 9.   Additionally,

Commerce determined that "the subject merchandise was sold directly

to the unaffiliated customers in the [U.S.] prior to importation."

<u>Preliminary Results</u>, 76 Fed. Reg. at 33,196.   Therefore, Commerce

concluded that all of TMI's U.S. sales were export price[4] ("EP")

sales and did not calculate a separate constructed export price

("CEP")[5] for TMI's U.S. sales.   <u>Id.</u>  Commerce did not adjust EP to

---

[3] "Normal value" is "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country." 19 U.S.C. § 1677b(a)(1)(B)(i).

[4] "Export price" refers to "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States." 19 U.S.C. § 1677a(a).

[5] "Constructed export price" refers to "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the

reflect the expenses TMI incurred in association with services Mr. James Gammons provided for TMI in the U.S.   See I&D Memo at 3.   On June 30, 2010 Commerce issued the preliminary results of the review, assigning TMI a weighted average dumping margin of 0.00%. Preliminary Results, 76 Fed. Reg. at 33,200.

On September 1, 2011, nearly eleven months after the October 19, 2010 deadline for the submission of new factual information, USM submitted a Chinese magnesium industry bulletin which allegedly indicated that [[        ]] produced retorts during the POR rather than rented them, as TMI reported.   See I.A.P.R. 11 at 2.   Commerce rejected USM's submission, concluding that "some of the documents submitted by [USM] were clearly available prior to the deadline for submission of factual information."   Id.

On December 9, 2011 Commerce issued the Final Results.   See Final Results, 76 Fed. Reg. at 76,945.   Although Commerce made certain changes to the margin calculation, it again assigned TMI a weighted average dumping margin of 0.00%.   Id. at 76,947.

### JURISDICTION and STANDARD OF REVIEW

This Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c).

This Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise

---

account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter" to an unaffiliated purchaser.   19 U.S.C. § 1677a(b).

not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

## DISCUSSION

USM argues that the Final Results are unsupported by substantial evidence and are otherwise not in accord with the law with respect to: Commerce's classification of retorts as an indirect material; the surrogate values used to calculate financial ratios, labor rates, and truck freight rates; and Commerce's refusal to adjust the U.S. price to reflect movement expenses associated with services Mr. James Gammons provided for TMI. See Pl.'s Br. Supp. Mot. J. Agency R. at 2-5 ("Pl.'s Br."). Additionally, USM argues that Commerce abused its discretion by rejecting USM's untimely submission. Id. at 1-2. Commerce asks for voluntary remand in order to reconsider the surrogate values for labor and financial ratios, but opposes USM's motion in all other respects. See Def.'s Br. at 1-2.

## I. USM's Untimely Submission

During the review, TMI reported that [[        ]] rented the retorts it used in the production of pure magnesium during the POR and that rental equipment was not treated as a direct expense for

accounting purposes in the PRC.   See P.R. 45 at 7.   Commerce classified retorts as an indirect material in the preliminary results of the review.   P.R. 64 at 9.   USM challenged that determination before Commerce, P.R. 79 at 5-23, and on September 1, 2011, submitted a newly-discovered Chinese magnesium industry bulletin which allegedly indicated that [[          ]] produced retorts during the POR.   See I.A.P.R. 11 at 2.   USM also submitted two pieces of corroborating evidence, a 2006 magnesium industry directory and a website USM alleges belongs to [[          ]].   Id. Although USM made the submission almost eleven months after the deadline for submission of new factual information, it insisted that Commerce place the submission on the record because it allegedly demonstrated that TMI deliberately misled Commerce by reporting that [[          ]] rented retorts.   Id.   Commerce rejected USM's submission because the website and the 2006 directory were "clearly available prior to the deadline for submission of factual information."   Id.   Commerce continued to classify retorts as an indirect material in the Final Results.   See I&D Memo at 6-9. USM argues that Commerce abused its discretion because it failed to address prima facie evidence of fraud contained in the untimely submission.[6]   See Pl.'s Br. at 14-16.

_____

[6] USM also argues that Commerce abused its discretion because the bulletin would have prevented a 20% understatement in the NV by ensuring that Commerce properly classified retorts as a direct material.   Pl.'s Br. at 10-14.   USM's argument is unpersuasive as the bulletin would not have negated Commerce's retort

Commerce has the discretion to establish and enforce deadlines for the submission of factual information.  See Grobest, 36 CIT at __, 815 F. Supp. 2d at 1365 (citing NTN Bearing Corp. v. United States, 74 F.3d 1204, 1206-07 (Fed. Cir. 1995)).  Commerce may extend such deadlines where it finds that there is "good cause" to do so.  19 C.F.R. § 351.302(b) (2012).  However, "Commerce's discretion in this regard is not absolute."  Grobest, 36 CIT at __, 815 F. Supp. 2d at 1365 (citing NTN Bearing, 74 F.3d at 1207).  In determining whether Commerce's rejection of an untimely submission amounts to an abuse of discretion, this Court considers "whether the interests of accuracy and fairness outweigh the burden placed on [Commerce] and the interest in finality."  Id.

Here, the court finds that Commerce abused its discretion because it failed to address prima facie evidence of fraud USM raised while the record was still open.  Courts have clearly indicated that prima facie evidence of fraud is to be treated differently than other untimely submitted factual information, allowing and even ordering consideration of such evidence after the closure of administrative proceedings.  See Home Prods. Int'l, Inc. v. United States, 633 F.3d 1369, 1381 (Fed. Cir. 2011) (ordering

_____

classification in and of itself, but would only be a factor in the classification determination.  Cf. Grobest & I-Mei Indus. (Vietnam) Co. v. United States, 36 CIT __, __, 815 F. Supp. 2d 1342, 1366-67 (2012) (reversing Commerce's decision to reject respondent's untimely submission of separate rate eligibility certification in part because it directly contradicted Commerce's decision to apply Vietnam-wide rates to respondent).

remand where prima facie evidence of fraud was discovered after the
close of the administrative review); Tokyo Kikai Seisakusho, Ltd.
v. United States, 529 F.3d 1352, 1361 (Fed. Cir. 2008) (recognizing
that Commerce's power to reconsider a determination is "even more
fundamental when . . . it is exercised to protect the integrity of
its own proceedings from fraud"); Tianjin Magnesium Int'l Co. v.
United States, 36 CIT __, __, 836 F. Supp. 2d 1377, 1381 (2012)
(Tsoucalas, Senior J.) (upholding Commerce's decision to consider
prima facie evidence of fraud discovered during remand).[7]

Here, USM discovered evidence that [[        ]] produced
retorts after TMI reported that [[        ]] rented retorts. See
I.A.P.R. 11 at 2. However, in dismissing USM submission, Commerce
limited its analysis to one factor: some of the documents were
available before the deadline. Id. Because of this single-minded
focus, Commerce overlooked the possibility that TMI deliberately
failed to report information to which it also clearly had access.
Prima facie evidence of fraud concerning proper classification of
FOP undermines the accuracy and fairness of a review. Grobest, 36

_____

[7] In a recent case evidencing the courts' treatment of
untimely discovered evidence of fraud, this Court granted
Commerce's motion to expand the scope of an already ordered remand
to consider new evidence that a party provided false information
during the review. Ad Hoc Shrimp Trade Action Comm. v. United
States, 37 CIT __, __, Slip Op. 13-4, at 9 (Jan. 9, 2013). The
Court held that Commerce provided compelling justification for
considering the untimely discovered evidence: there was
"information sufficient to persuade [Commerce] that its
determinations in the administrative review at issue may have been
based on information that was false or incomplete." Id. at 8.

CIT at __, 815 F. Supp. 2d at 1365.  Commerce should have exercised its authority to protect the review from fraud by addressing that evidence in its analysis.  Tokyo Kikai, 529 F.3d at 1361.

Additionally, the burden on Commerce and its interest in finality are relatively minimal in the instant case.  First, USM submitted the information over two months before Commerce placed information and new comments concerning the surrogate value for truck freight onto the record and three months before Commerce issued the Final Results.[8]  See NTN Bearing, 74 F.3d at 1208 (noting that because preliminary results are subject to change, "the tension between finality and correctness simply [does] not exist" during that stage).  Second, USM presented the evidence while the proceedings were still open and Commerce did not address the apparent fraud in  its determination.  See I.A.P.R. 11 at 2. As noted above, Courts approved and even ordered the reopening of proceedings to consider prima facie evidence of fraud discovered after the close of proceedings.  See Home Prods., 633 F.3d at 1381; Tokyo Kikai, 529 F.3d at 1361; Tianjin Magnesium, 36 CIT at __, 836 F. Supp. 2d at 1381.  Therefore, taking into account the relatively

---

[8] Commerce insists that its decision to solicit and place the information concerning surrogate data for truck freight onto the record is distinguishable from the instant issue because Commerce used that information during the preliminary results stage but "inadvertently failed to place it on the record."  Def.'s Br. at 13.  However, this argument is unconvincing because it overlooks Commerce's decision to place new comments from both parties on the record as well.  See Pl.'s Br. at 10 & n.11, 13; I.A.P.R. 23.

low burden of accepting the late submission in this case, Commerce's failure to address prima facie evidence of fraud that USM presented during the proceeding was an abuse of discretion.

TMI argues that Commerce's determination should nevertheless be upheld because the information contained in the bulletin was immaterial to Commerce's retort classification. See Def.-Intervenor Resp. Br. at 4. Specifically, TMI argues that Commerce did not consider whether [[        ]] rented or produced retorts when classifying them as indirect materials. Id. However, TMI's argument must fail for a three reasons. First, Commerce made its decision without considering the information in USM's submission because it was not on the record. Second, classifying retorts as a direct material results in a higher NV and, accordingly, alters the dumping margin. See Pl.'s Br. at 12. Finally, should USM's submission ultimately indicate fraudulent conduct by TMI, Commerce may decide to apply adverse facts available to the issue of retort classification. See 19 U.S.C. § 1677e(b). The information contained in the bulletin is material to the classification of retorts and, as such, Commerce should have considered whether the bulletin contained prima facie evidence of fraud.

Accordingly, the court remands this issue so that Commerce may consider whether the bulletin presents prima facie evidence of fraud. On remand, Commerce is not required to place the bulletin and the associated materials onto the record, but it must provide

an adequate explanation addressing the evidence of fraud should it elect not to do so.   To guide its decision, Commerce should consider the factors outlined in Home Products, including "the interests in finality, the extent of the inaccuracies in the . . . administrative review, whether fraud existed in the . . . administrative review, the strength of the evidence of fraud, the level of materiality, and other appropriate factors." Home Prods., 633 F.3d at 1381.

## II. Classification of Retorts

Commerce classified retorts as indirect materials because they "are not physically incorporated into the final magnesium product and are replaced too infrequently to be considered a direct material." See I&D Memo at 8.   Commerce also determined that [[         ]] classifies retorts as an indirect material in its accounting records.   Id. at 7.   As such, Commerce accounted for retort costs as factory overhead in the FOP calculation.   Id. at 8.

USM claims that Commerce erroneously reclassified retorts as an indirect material, treating them as factory overhead in the FOP calculation and understating the NV.   See Pl.'s Br. at 17.   USM insists that retorts should be classified instead as a direct material, id., and offers four arguments in support of its claim: (1) Commerce wrongfully reclassified retorts as an indirect material, ignoring the accounting practices of [[      ]] without showing that those practices were distortive; (2) Commerce limited

its analysis to physical incorporation and consumption frequency while ignoring evidence that detracted from its conclusion in violation of this Court's holding in <u>Bridgestone Americas, Inc. v. United States</u>, 34 CIT __, 710 F. Supp. 2d 1359 (2010); (3) Commerce failed to articulate a standard for its useful consumption frequency determination; and (4) Industry practice is to treat retorts as a direct material. <u>See</u> Pl.'s Br. at 17–28. Commerce argues that its determination was consistent with both [[        ]]'s accounting records and the holding in <u>Bridgestone</u>. <u>See</u> Def.'s Br. at 17–25.

The court cannot now determine whether Commerce's classification was based on substantial evidence because Commerce may choose to place USM's untimely submission on the record during the remand proceeding.  The results of that determination will potentially impact Commerce's classification of retorts. Accordingly, the court will defer further consideration of this issue in order to allow Commerce to revisit its classification of retorts in light of its decision concerning USM's untimely submission.  <u>See</u> <u>Amanda Foods (Vietnam) Ltd. v. United States</u>, 33 CIT __, __, 647 F. Supp. 2d 1368, 1379 (2009) (deferring judgment on Commerce's surrogate value selection because it would likely be impacted by remand result of the surrogate country determination).

### III. Surrogate Values

"Commerce ordinarily determines the [NV] of subject

merchandise of an exporter or producer from a [NME] country 'on the basis of the value of the [FOP] utilized in producing the merchandise.'" <u>Shantou Red Garden Foodstuff Co. v. United States</u>, 36 CIT __, __, 815 F. Supp. 2d 1311, 1316 (2012) (quoting 19 U.S.C. § 1677b(c)(1)).  This procedure seeks "to assess the 'price or costs' of [FOP]" of subject merchandise in a comparable market economy "in an attempt to construct a hypothetical market value of that product." <u>Nation Ford Chem. Co. v. United States</u>, 166 F.3d 1373, 1375 (Fed. Cir. 1999).  Because "the process of constructing foreign market value for a producer in a [NME] is difficult and necessarily imprecise," <u>id.</u> at 1377 (quoting <u>Sigma Corp. v. United States</u>, 117 F.3d 1401, 1407 (Fed. Cir. 1997)), Commerce must use the "best available information" to select surrogate values for each of the FOP.  19 U.S.C. § 1677b(c)(1).

When selecting the best available surrogate value, Commerce "normally will use publicly available information to value [FOP]," 19 C.F.R. § 351.408(c)(1), and it prefers to use data "reflect[ing] a broad market average . . . contemporaneous with the period of review, specific to the input in question, and exclusive of taxes on exports." <u>Fuwei Films (Shandong) Co. v. United States</u>, 36 CIT __, __, 837 F. Supp. 2d 1347, 1350-51 (2012).  Commerce has "broad discretion to determine the 'best available information.'" <u>Goldlink Indus. Co. v. United States</u>, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006) (quoting <u>Timken Co. v. United States</u>, 25 CIT

939, 944, 166 F. Supp. 2d 608, 616 (2001)).  When reviewing
Commerce's surrogate value selection, "[t]he Court's role is not to
make that determination anew, but rather to decide 'whether a
reasonable mind could conclude that Commerce chose the best
available information.'" China First Pencil Co. v. United States,
34 CIT __, __, 721 F. Supp. 2d 1369, 1375 (2010) (quoting QVD Food
Co. v. United States, 34 CIT __, __, 721 F. Supp. 2d 1311, 1315
(2010), aff'd, 658 F.3d 1318 (Fed. Cir. 2011)).

### A. Surrogate Value for Truck Freight

Commerce selected Infobanc as the surrogate for truck freight
rates in India because "Infobanc data are contemporaneous, country-
wide, and identify the relevant time period, distances, and
weights."  I&D Memo at 16.  Additionally, Commerce noted that it
has "traditionally relied on truck freight data published by
Infobanc to determine the [surrogate value] for inland freight."
Id. Although Commerce acknowledged flaws and omissions in the
Infobanc rates, it still considered them to be the best available
information because of flaws in the two alternative surrogates
suggested by USM, World Bank's rates from its survey "Trading
Across Borders in India" and the rates from Gati, Ltd. ("Gati"), a
truck freight company operating in India.  See id. at 16-18.
Specifically, Commerce rejected World Bank's rates because they
included the prices of various means of inland transportation, id.
at 16-17, and Gati's rates because it prefers to use rates that

"reflect[] numerous transactions between many buyers and sellers"
over the rates from a single company. Id. at 18. USM argues that
Infobanc rates are unreliable and Commerce's selection was
unsupported by substantial evidence in the record. See Pl.'s Br.
at 31-37.[9]

"Commerce is not permitted to select a surrogate value by
default." Taian Ziyang Food Co. v. United States, 35 CIT __, __,
783 F. Supp. 2d 1292, 1328 (2011). When choosing between imperfect
data sets, "Commerce's analysis must do more than simply identify
flaws in the data sets it rejects." Guangdong Chems. Imp. & Exp.
Corp. v. United States, 30 CIT 1412, 1417, 460 F. Supp. 2d 1365,
1369 (2006). "[T]he law requires Commerce to make a reasoned
decision as to the source on which it chooses to rely, and to both
adequately explain its rationale and support its decision by
reference to substantial evidence in the record." Taian Ziyang, 35
CIT at __, 783 F. Supp. 2d 1292 at 1329. Commerce erred in failing
to support its selection of Infobanc rates with substantial
evidence and in ignoring contradictory evidence on the record.

First, Commerce does not appear to have supported its
determination with reference to substantial evidence in the record.

---

[9] USM also asks that the court order Commerce to select World
Bank rates, Gati's rates, or both. See Pl.'s Br. at 37. However,
this Court will not review alternative surrogate value decisions de
novo in order to replace Commerce's selection with one of its own.
See China First Pencil Co., 34 CIT at__, 721 F. Supp. 2d at
1375(quoting QVD Food Co., 34 CIT at __, 721 F. Supp. 2d at 1315).

As noted above, Commerce stated that it selected Infobanc rates because they are "contemporaneous, country-wide, and identify the relevant time period, distances, and weights." I&D Memo at 16. Underlying that finding is Commerce's conclusion that Infobanc rates "represent actual transaction prices reflecting truck freight between a number of Indian cities." Def.'s Br. at 32.  However, Commerce does not cite any evidence in the record in support of this claim.  See id. at 32–33.  Instead, Commerce cites earlier reviews where it relied on Infobanc rates.  See id. (citing Wooden Bedroom Furniture from the PRC: Final Results and Final Rescission in Part, 75 Fed. Reg. 50,992 (Aug. 18, 2010) and Certain New Pneumatic Off-the-Road Tires from the PRC: Final Results of the 2009-2010 Antidumping Duty Administrative Review and Final Rescission, in Part, 77 Fed. Reg. 14,495 (Mar. 12, 2012)). However, Commerce's reliance on Infobanc in earlier reviews simply does not support its present conclusion that Infobanc rates reflect real transaction prices throughout India.[10]  Moreover, Commerce's proffered evidence fails to establish a link between the rates and

---

[10]  Commerce argues, by reference to earlier reviews, that Infobanc's website has a "Directory of Logistics Operators, which would indicate that Infobanc data is likely not from a single logistics company."  See Def.'s Br. at 33 (citing Certain New Pneumatic Off-the-Road Tires from the PRC: Issues and Decision Memorandum for the Final Results of the 2009-2010 Administrative Review of the Antidumping Duty Order at 18, Inv. No. A-570-912 (Mar. 5, 2012) (emphasis added).  However, that Commerce previously found that Infobanc possibly sources its information from multiple companies is not persuasive, especially when the record lacks evidence in support of that conclusion.

any actual transaction prices.  Without record evidence to support the use of Infobanc rates, a reasonable person could not select them as the best available surrogate.  China First Pencil Co., 34 CIT at __, 721 F. Supp 2d at 1375.

Second, Commerce's selection is flawed because the record does not contain any explanatory information indicating the reliability, sources, or methodology behind Infobanc rates.  See Allied Pac. Food (Dalian) Co. v. United States, 34 CIT __, __, 716 F. Supp. 2d 1339, 1350 (2010) (sustaining Commerce's decision to reject a proposed surrogate where record evidence indicated that the prices "lack[ed] supporting data on total value and volume and ha[d] deficiencies with respect to count size"); Wuhan Bee Healthy Co. v. United States, 31 CIT 1182, 1195 (2007) (not published in the Federal Supplement) (sustaining Commerce's decision to reject an Indiainfoline article because it contained "no additional information on the author's qualifications or the sources of his information").  Here, USM specifically points out that "the essential terms of the posted rates are unknown, including whether the rates (1) relate to offers for shipments or reflect actual transactions, (2) apply to containerized or bulk shipments, (3) reflect long term contract or spot prices, and (4) are inclusive of loading and unloading costs."  Pl.'s Br. at 34-35.  While Commerce itself recognized this infirmity, admitting that it was "unclear whether Infobanc truck rate data on the record include costs

associated with those activities," I&D Memo at 18, it overlooked this flaw because it "assume[d] the surrogate truck freight rate used includes all costs associated with activities relating to truck freight, absent evidence to the contrary." Id. In fact, the record contains little information concerning the Infobanc data, as each set of monthly prices merely includes the single explanatory phrase: "Rupees per tonne for nine tonnes." See generally I.A.P.R. 20 Att. 2. Ultimately, Commerce fails to identify evidence in the record sufficient to demonstrate the reliability of Infobanc rates.

Further, record evidence indicates that during the POR there was a significant divergence between Infobanc rates and diesel fuel prices, which comprise a significant portion of truck freight rates. See I.A.P.R. 20 Att. 2; P.R. 56 Ex. 1, Att. 8. The record demonstrates that Infobanc rates fell 17% during the POR, I.A.P.R. 20 Att. 2; Pl.'s Br. at 33 n.53, while diesel fuel prices increased by 17%. See P.R. 56 Ex. 1, Att. 8; Pl.'s Br. at 32 n.50. Commerce disagreed with USM's characterization of the price trends, arguing that USM "misconstrue[d] the circumstances" in which the diesel prices were measured by basing its calculations on inflated prices. See I&D Memo at 17. Commerce's conclusion is contradicted by the record, which contains uninflated prices from Indian Oil Corp. during the POR depicting the price increase in diesel fuel. See P.R. 56 Ex. 1, Att. 8.

Commerce argues that Infobanc data is still the best available

information because of flaws in the alternative data sets.  See I&D Memo at 18.  However, Commerce's rebuttal of World Bank and Gati data does not cure its failure to adequately explain its reliance upon Infobanc data.  See Guangdong Chems., 30 CIT at 1417, 460 F. Supp. 2d at 1369; Longkou Haimeng Machinery Co. v. United States, 32 CIT 1142, 1164-65, 581 F. Supp. 2d 1344, 1363-64 (ordering remand where Commerce provided adequate reasoning for rejecting potential surrogate data but failed to adequately "explain its reliance" on the data set it selected) (Tsoucalas, Senior J.). Commerce was still required to provide a reasonable explanation of its selection of Infobanc rates with substantial evidence from the record.  See Taian Ziyang, 35 CIT at ___, 783 F. Supp. 2d 1292 at 1329.

For the foregoing reasons, the court must remand Commerce's determination.  On remand Commerce must either adequately explain its rationale for selecting Infobanc data with support from substantial evidence in the record or select a new surrogate for truck freight rates.

## B. Surrogate Value for Financial Ratios

Commerce selected the financial statements of Hindalco Industries Ltd. ("Hindalco") to calculate surrogate financial ratios.  I&D Memo at 11.  USM argues that Hindalco's financial statements were not the best available information because the majority of Hindalco's production is dedicated to non-comparable

merchandise and Hindalco received countervailable subsidies during the POR. <u>See</u> Pl.'s Br. at 28–31. Commerce "requests a remand to reconsider [USM]'s argument concerning Commerce's selection of Hindalco's financial statement for calculating surrogate financial ratios and to determine whether Hindalco's financial statement continues to be the best available information on the record." Def.'s Br. at 35. Accordingly, USM's request to remand for reconsideration of the surrogate financial ratios is granted.

### C. Surrogate Value for Labor

USM alleges that "Commerce made two errors when calculating the surrogate value for labor": (1) Commerce selected the wrong base period for the inflation adjustment, using May 1, 2007 through April 30, 2008 instead of April 1, 2007 through March 31, 2008 and (2) "Commerce derived the inflation adjustment using India's wholesale price index, when its labor policy bulletin identified the Consumer Price Index as the preferred index." Pl.'s Br. at 39. Commerce requests that this Court remand the surrogate for labor so that it might "examine these allegations." Def.'s Br. at 34. Accordingly, USM's request to remand for reconsideration of the surrogate value for labor is granted.

### III. U.S. Movement Expenses

During the review, TMI reported that Mr. James Gammons engaged in certain "ministerial activities" on behalf of TMI. P.R. 61 at 3. Commerce concluded that TMI incurred "expenses on facilitation"

in association with the services Mr. Gammons provided, which included "contact[ing] customshouse brokers, freight forwarders, trucking companies, [and] warehouse companies." I&D Memo at 4. However, Commerce determined that TMI did not incur any selling expenses in the U.S and that "the record contains no evidence that Mr. Gammons engaged in sales of the subject merchandise on behalf of TMI or took possession of the subject merchandise." Id. Thus, Commerce decided not to adjust the U.S. sales price to reflect the expenses TMI incurred in payment of Mr. Gammons' services.  Id. Additionally, Commerce noted that all of TMI's U.S. sales were EP sales[11] and therefore TMI was not required to report sales expenses incurred in the U.S. because generally such expenses "are captured in the surrogate financial ratios under the NME FOP methodology to calculate [NV] for EP sales." Id. USM argues that the expenses at issue were movement expenses and therefore Commerce was required to deduct them from the U.S. price under 19 U.S.C. § 1677a(c)(2)(a) regardless of whether they were associated with CEP or EP sales. See Pl.'s Br. at 39.

When calculating EP or CEP, Commerce is directed to reduce the price by "the amount, if any, included in such price, attributable

---

[11] Commerce calculates EP "if the first sale to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for export to the United States is made by the producer or exporter in the foreign market prior to the date of importation."  Import Administration, Antidumping Manual, ch. 7, p. 3 (Oct. 13, 2009) (emphasis added).

to any additional costs, charges, or expenses, and [U.S.] import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the [U.S.]" 19 U.S.C. § 1677a(c)(2)(A).  When calculating CEP, Commerce makes certain additional adjustments for selling expenses incurred in the U.S., including commissions, credit expenses, guarantees, and warrantees.  See 19 U.S.C. § 1677a(d)(1).  However, under the NME methodology, Commerce does not adjust EP for those expenses incurred in the U.S., as they are included in the FOP calculation of NV under selling, general and administrative expenses.  See Antidumping Manual, ch. 10 at p. 11; I&D Memo at 4.  The issue before the court is whether the expenses TMI incurred were movement expenses, for which Commerce must adjust U.S. sales price under 19 U.S.C. § 1677a(c)(2)(A).

Here, Commerce's decision not to adjust EP was supported by substantial evidence because the expenses associated with Mr. Gammon's services are not movement expenses.  See 19 U.S.C. § 1677a(c)(2)(A).  The services Mr. Gammons provided, which included "contact[ing] customshouse brokers, freight forwarders, trucking companies, [and] warehouse companies," I&D Memo at 4, were too attenuated from the actual movement of subject merchandise to be considered movement expenses.  Mr. Gammons did not move or store the goods nor was he compensated for such services.  The record supports Commerce's conclusion that Mr. Gammons "contacted" such

service providers on behalf of TMI, but did not enter contracts or act as an agent on TMI's behalf.  <u>See</u> P.R. 61 at 3.  The prior reviews USM cites are unpersuasive because they are easily distinguishable from the instant case: they concern costs associated with the <u>actual movement</u> of goods.  <u>See</u> <u>Issues and Decision Memorandum for the Final Determination in the Antidumping Investigation of Chlorinated Isocyanurates from Spain</u> at 20, Inv. No. A-469-814 (May 2, 2005) (freight forwarding costs are an element of U.S. movement expenses) and <u>Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Silicon Metal from the Russian Federation</u>, 67 Fed. Reg. 59,253, 59,261–62 (Sept. 20, 2002) (U.S. inland freight costs are an element of U.S. movement expenses).  The "expenses on facilitation," <u>I&D Memo</u> at 4, associated with Mr. Gammons' services cannot be considered movement expenses.  Therefore, Commerce's determination regarding Mr. Gammons' services was reasonable.

CONCLUSION

For the foregoing reasons the court concludes that the <u>Final Results</u> are sustained with regard to the U.S. movement expenses but remanded as to USM's untimely submission and the surrogate values for truck freight, labor, and financial ratios.  The court defers judgment on the issue of retort classification so Commerce has an opportunity to reconsider its chosen classification should Commerce place USM's untimely submission on the record during remand.

**ORDER**

In accordance with the above, it is hereby

**ORDERED** that this case is to be remanded to the United States Department of Commerce, International Trade Administration, to reconsider its findings regarding USM's untimely submission and the surrogate values for truck freight, labor, and financial ratios; and it is further

**ORDERED** that the <u>Final Results</u> are sustained with respect to United States movement expenses; and it is further

**ORDERED** that remand results are due within ninety (90) days of the date this opinion is entered.  Any responses or comments are due within thirty (30) days thereafter.  Any rebuttal comments are due within fifteen (15) days after the date responses or comments are due.

<u>  /s/ NICHOLAS TSOUCALAS  </u>
**Nicholas Tsoucalas**
**Senior Judge**

**Dated:**<u>  January 22, 2013  </u>
        **New York, New York**