Slip Op. 15-47

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                        :
US MAGNESIUM LLC,                       :
                                        :
            Plaintiff,                  :
                                        :
                v.                      :
                                        :
UNITED STATES,                          :        Before: Richard K. Eaton, Judge
                                        :
            Defendant,                  :        Court No. 12-00006
                                        :
            and                         :
                                        :
TIANJIN MAGNESIUM                       :        PUBLIC VERSION
INTERNATIONAL CO., LTD.,                :
                                        :
            Defendant-Intervenor.       :
_____ :
```

**OPINION**

[The Department of Commerce's Final Results of Redetermination are sustained.]

Dated: May 21, 2015

*Jeffery B. Denning*, King & Spalding LLP, of Washington, D.C., argued for plaintiff. With him on the brief was *Stephen A. Jones*.

*Eric E. Laufgraben*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Melissa M. Brewer*, Attorney-International, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

*David A. Riggle*, Riggle & Craven, of Chicago, IL, argued for defendant-intervenor. With him on the brief was *David J. Craven*.

EATON, Judge:  Before the court are the final results of redetermination pursuant to court remand, dated July 11, 2013, of the administrative review of the antidumping duty order on pure magnesium from the People's Republic of China ("PRC") for the period of review May 1, 2009 through April 30, 2010 ("POR").  *See Final Results of Redetermination Pursuant to Ct. Remand* at 3 (ECF Dkt. No. 86-1) ("Remand Results"); *US Magnesium LLC v. United States*, 37 CIT __, 895 F. Supp. 2d 1319 (2013) (Tsoucalas, J.) ("*USM I*"); *see also* Pure Magnesium From the PRC, 76 Fed. Reg. 76,945 (Dep't of Commerce Dec. 9, 2011) (final results of the 2009–2010 antidumping duty administrative review of the antidumping duty order), and accompanying Issues and Decision Memorandum, PD 28 (Part 2), ECF Dkt. No. 25 ("Issues & Dec. Mem.") (collectively, the "Final Results"); Pure Magnesium From the PRC, the Russian Federation and Ukraine, 60 Fed. Reg. 25,691 (Dep't of Commerce May 12, 1995) (notice of antidumping duty orders).  For the reasons set forth below, the Department of Commerce's ("Commerce" or the "Department") Remand Results are sustained.


## BACKGROUND

Defendant-intervenor Tianjin Magnesium International Co., Ltd ("Tianjin") is an importer of pure magnesium supplied by its sole producer, Company A.[1]  On January 18, 2012, plaintiff US Magnesium LLC ("USM"), a domestic producer of pure magnesium, commenced this action, challenging several determinations made by the Department in the Final Results. Compl. (ECF Dkt. No. 9).  The challenged determinations were made in the Final Results as part of the Department's factors of production ("FOP") methodology for calculating normal value.

---

[1]        [[                                                                                                  ]] identity is being withheld as business-proprietary information.  All references to this company hereinafter will be to "Company A."

First, Commerce characterized the retorts used in Company A's manufacturing process as an

indirect material input and treated expenses associated with the retorts as part of factory

overhead.  Issues & Dec. Mem. at 8.  In making that finding, Commerce rejected, as untimely,

information submitted by USM (the "untimely submission") that it claimed provided *prima facie*

evidence that Tianjin had submitted fraudulent information regarding whether Company A

rented retorts, rather than self-produced them.  *See* Mem. from Eve Wang, Case Analyst, to The

File at 2, PD 11 (Part 2) (Sept. 20, 2011), ECF Dkt. No. 25 ("Submission Rejection Mem.").

Second, Commerce selected the surrogate values used to calculate financial ratios, labor rates,

and truck freight based on (1) Hindalco Industry Limited's ("Hindalco")[2] 2009–2010 audited

financial statements, (2) data from the 2007–2008 Indian Annual Survey of Industries[3] ("ASI"),

and (3) Infobanc[4] data, respectively.  Issues & Dec. Mem. at 6, 11, 18.

The *USM I* Court (1) remanded the issue of USM's untimely submission and instructed

the Department to consider whether it should be placed on the record, (2) deferred considering

the issue of whether the retorts were properly treated as an indirect material input and valued as

factory overhead, or whether the Department should have treated the retorts as a direct material

---

[2]        Hindalco is a producer of aluminum and copper and part of the Aditya Birla
Group.  *See* Letter from David A. Riggle, Riggle & Craven, to Gary Locke, Secretary of
Commerce at 844, 846, PD 30 (Part 1) (Dec. 7, 2010), ECF Dkt. No. 25.

[3]        The Annual Survey of Industries is a public source of industrial statistics in India,
set up and conducted pursuant to statute.  *See Annual Survey of Industries (ASI)*, MINISTRY OF
STATISTICS & PROGRAMME IMPLEMENTATION, GOV'T OF INDIA,
http://mospi.nic.in/mospi_new/upload/asi/ASI_main.htm?status=1&menu_id=88 (last visited
May 6, 2015).

[4]        Infobanc (Infobanc.com) is a business-to-business website (or portal) that
provides customer and market research databases, a "network of international buyers," and other
services to businesses.  *See Frequently Asked Questions*, INFOBANC, http://help.infobanc.com
(last visited May 5, 2015).

input, "in order to allow Commerce to revisit its [characterization]. . . in light of its decision concerning USM's untimely submission," and (3) held that the Department's selection of the surrogate for truck freight was unclear and remanded for the Department to "explain its rationale . . . or select a new surrogate for truck freight rates."  *See USM I*, 37 CIT at __, 895 F. Supp. 2d at 1326, 1327, 1330 (citation omitted).  The *USM I* Court also granted the Department's request for a voluntary remand regarding the surrogate values for financial ratios and labor rates.  *See id*. at __, 895 F. Supp. 2d at 1330, 1331.

On remand, the Department continued to treat retorts as an indirect material input covered by the value of overhead expenses, found no evidence of fraud by Tianjin based on evidence contained in USM's untimely submission, used World Bank[5] data to calculate the surrogate value for truck freight, relied on the 2006–2007 financial statements of aluminum producer Madras Aluminium Limited Company ("MALCO") as the basis for calculating the financial ratios, and made an adjustment to its labor rate calculation.  Remand Results at 2, 3, 21, 30, 31.  These changes resulted in a 51.26 percent margin for Tianjin.[6]  Remand Results at 3.

---

[5]     The World Bank collected the data used to calculate the surrogate value for truck freight "as part of the Doing Business project, which measures and compares regulations relevant to the life cycle of a small- to medium-sized domestic business in 183 economies."  *See* Letter from Jeffery B. Denning, King & Spalding LLP, to Hon. Gary Locke, Secretary of Commerce at 300, PD 29 (Part 1) (Dec. 7, 2010), ECF Dkt. No. 25 ("USM's Surrogate Value Submission").  In doing so, World Bank sent its *Trading Across Borders Questionnaire* to companies in India and "[l]ocal freight forwarders, shipping lines, customs brokers, port officials and banks provide[d] information on . . . cost . . . ."  *See* USM's Surrogate Value Submission at 304, 355.

[6]     In the Final Results, Commerce had calculated a 0.00 percent margin for Tianjin. Pure Magnesium From the PRC, 76 Fed. Reg. at 76,947.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order."  *Yantai Xinke Steel Structure Co. v. United States*, 38 CIT __, __, Slip Op. 14-38, at 4 (2014) (quoting *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38 CIT __, __, Slip Op. 14-17, at 3 (2014)) (internal quotation marks omitted).

## DISCUSSION

### I.   LEGAL FRAMEWORK

"The United States imposes duties on foreign-produced goods that are sold in the United States at less-than-fair value."  *Jacobi Carbons AB v. United States*, 38 CIT __, __, 992 F. Supp. 2d 1360, 1365 (2014) (quoting *Clearon Corp. v. United States*, 37 CIT __, __, Slip Op. 13-22, at 4 (2013)) (internal quotation marks omitted).  When making the fair value determination, Commerce is required to make "a fair comparison . . . between the export price[7] or constructed export price[8] and normal value."  *See* 19 U.S.C. § 1677b(a).

---

[7]      "Export price" is defined as
the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States.
19 U.S.C. § 1677a(a).

[8]      "Constructed export price" is defined as
the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the
(footnote continued)

Ordinarily, in a case such as this where the subject merchandise is exported from a

nonmarket economy country,[9] "the normal value of the subject merchandise [is determined

based on] the value of the factors of production utilized in producing the merchandise and [an]

added . . . amount for general expenses and profit plus the cost of containers, coverings, and

other expenses."  *See id.* § 1677b(c)(1).  By statute, to find these surrogate values, Commerce is

directed to use, "to the extent possible, the prices or costs of factors of production in one or more

market economy countries that are . . . at a level of economic development comparable to that of

the nonmarket economy country[] and . . . significant producers of comparable merchandise."

*Id.* § 1677b(c)(4).  When valuing factors of production, Commerce must use "the best available

information regarding the values of such factors in a market economy country or countries

considered to be appropriate by the [Department]."  *Id.* § 1677b(c)(1).  In selecting the best

available information, Commerce's practice "is to 'choose surrogate values that represent broad

market-average prices, prices specific to the input, prices that are net of taxes and import duties,

prices that are contemporaneous with the POR, and publicly available non-aberrational data from

---

producer  or  exporter  of  such  merchandise  or  by  a  seller  affiliated  with  the
producer  or  exporter,  to  a  purchaser  not  affiliated  with  the  producer  or  exporter.
19 U.S.C. § 1677a(b).

[9]      A "nonmarket economy country" is "any foreign country that [Commerce]
determines does not operate on market principles of cost or pricing structures, so that sales of
merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. §
1677(18)(A).  "Because the Department deems the PRC 'to be a nonmarket economy country,
Commerce generally considers information on sales in [the PRC] and financial information
obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a),
the normal value of the subject merchandise.'"  *Jacobi Carbons*, 38 CIT at __ n.11, 992 F. Supp.
2d at 1365 n.11 (alteration in original) (quoting *Shanghai Foreign Trade Enters. Co. v. United
States*, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004)).  "Accordingly, Commerce invokes
a different statutory procedure for determining normal value if the subject merchandise is
exported from a nonmarket economy country."  *Shanghai Foreign Trade Enters.*, 28 CIT at 481,
318 F. Supp. 2d at 1341.

a single surrogate market-economy.'"  *Jacobi Carbons*, 38 CIT at __, 992 F. Supp. 2d at 1366

(quoting *Clearon*, 37 CIT at __, Slip Op. 13-22, at 7) (citing 19 C.F.R. § 351.408(c)(2)).  Thus,

to determine normal value of subject merchandise exported from a nonmarket economy country,

Commerce first must "assess the 'price or costs' of factors of production of [the product at issue]

in [a surrogate market economy country] in an attempt to construct a hypothetical market value

of that product in [the nonmarket economy country]."  *See Nation Ford Chem. Co. v. United

States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

As to financial ratios, "[i]n non-market economy antidumping cases, such as this, in

selecting financial statements to calculate the financial ratios used to determine an exporter's

dumping margin, 'Commerce looks to specificity, contemporaneity, and quality of the data.'"

*Yantai*, 38 CIT at __, Slip Op. 14-38, at 23 (quoting *Dongguan Sunrise Furniture Co. v. United

States*, 37 CIT __, __, 904 F. Supp. 2d 1359, 1366 (2013)).


II.     LABOR RATE ADJUSTMENT

In the Remand Results, Commerce made two corrections to the surrogate value for labor.

*See* Remand Results at 3, 21 ("The Department agrees with USM that it erred when inflating the

labor rate with respect to the base period and used the incorrect index to adjust for inflation in the

*Final Results*.  Accordingly, the Department . . . corrected those two errors for [the] draft results

of redetermination.").  First, the Department corrected the base period it had used to adjust for

inflation by changing the period from May 1, 2007 through April 30, 2008 to a period

contemporaneous with that of the data itself, April 1, 2007 through March 31, 2008.  *See*

Remand Results at 21.  Second, Commerce selected "the consumer price index typically used to

adjust for inflation in accordance with the Department's labor policy bulletin," rather than the

wholesale price index from India that Commerce had used in the Final Results.  *See* Remand

Results at 21.

Because Commerce was reasonable in choosing a time period more contemporaneous

with the data and used the consumer price index in accordance with its past practice, and because

neither USM nor Tianjin challenge the adjustment, it is sustained.


**III.     USM'S ARGUMENTS**

**A.  Characterization of Retorts as Factory Overhead**

USM objects to the Department's characterization of the retorts, used in the production of

pure magnesium, as an indirect input, valued as part of factory overhead, rather than a direct

input.

"Retorts" are steel tubes used during the purification process of magnesium.  Tianjin

"imports pure magnesium supplied by a sole producer," Company A, which "produces pure

magnesium via the 'Pidgeon' process."  *USM I*, 37 CIT at __, 895 F. Supp. 2d at 1322 (citation

omitted).  To produce pure magnesium using this process, Company A "first treats magnesium-

bearing dolomite in a kiln to produce calcined dolomite."  *Id.*  Next, the calcined dolomite is

mixed with ferrosilicon and fluorite powder.  *Id.*  Company A then "presses the mixture into

balls or briquettes" and,

> [i]n order to . . . chemically and physically separate [the magnesium] from the
> other inputs[,] . . . places the pressed mixture into retorts, which are "steel tubes
> placed under a vacuum in a furnace."  The high heat from the furnace vaporizes
> the magnesium, which travels through the retort and then "condense[s] into a
> highly purified form."

*Id.* (alteration in original) (quoting Def.'s Opp'n to Pl.'s Mot. for J. upon the Agency R. 5 (ECF

Dkt. No. 41)) (citing Issues & Dec. Mem. at 7 n.39).

The court finds that a review of the steps the Department took, the evidence it considered,

and its past practice, demonstrate that the decision to treat the retorts as overhead rather than a

direct material was based on substantial evidence and is in accordance with law.  Thus, for the

following reasons, the Department's characterization of retorts as overhead is sustained.

To begin with, in the Final Results, the Department noted that "[i]ndirect materials are

usually: (1) items used in the production process, but not traceable to a particular product; *or* (2)

items that are added directly to products, but whose cost is so small that the effort of tracing that

cost to individual products would be greater than the benefit of accuracy."  Issues & Dec. Mem.

at 8 (emphasis added).  Here, the Department found that the retorts "are not physically

incorporated into the final product and are replaced too infrequently to be a direct material."  *See*

Issues & Dec. Mem. at 8; Remand Results at 30.  In support of these conclusions, the

Department noted that there was no record evidence "that the retorts are traceable to specific

magnesium products [and USM] conceded that [the] retorts are not physically incorporated into

the final product."  *See* Issues & Dec. Mem. at 9.  Instead, according to Commerce, the record

indicated that the "retorts are steel tubes inside furnaces[,] . . . where [precursor materials] react

to form magnesium vapors which are then condensed and later re-melted into ingots."  *See* Issues

& Dec. Mem. at 9.  Indeed, there is no real dispute that the retorts are not physically incorporated

into the pure magnesium product.

With regard to cost, USM suggests that the cost of retorts supports a finding that they are

a direct material input and argues that "Commerce . . . improperly determined that retorts are an

indirect material based on a finding that the associated 'cost is so small that the effort of tracing

the cost[] to individual products would be greater than the benefit of . . . accuracy.'"  US

Magnesium's Comments Concerning Commerce's Redetermination Pursuant to Remand 38

(ECF Dkt. No. 94) ("Pl.'s Br.") (quoting Remand Results at 14).  USM, however, misconstrues

the Department's point.  In the Remand Results, Commerce stated that "[u]nder the

Department's practice, indirect materials are usually items used in the production process, but

are not traceable to a particular product, *or* items that are added directly to products, but whose

cost is so small that the effort of tracing that cost to individual products would be greater than the

benefit of accuracy."  Remand Results at 14 (emphasis added).  The Department, however, only

made reference to a small cost as being an indication that an input was an indirect material in

order to give a complete statement of its rule, not as a finding of fact.  Commerce's finding of

fact was that the retorts were an indirect material because they were not incorporated into the

resulting magnesium, not because their cost was small.  USM's argument, thus, is without merit.

Also, in the Final Results, from which Commerce did not depart in the Remand Results,

the Department determined that the evidence USM placed on the record during the investigation

in an attempt to demonstrate that the retorts were considered a direct material input by the

magnesium industry was inconclusive.  *See* Issues & Dec. Mem. at 9; Remand Results at 30.  In

particular, it first found financial reports from a ten-year-defunct company, Southern Magnesium

& Chemicals Ltd., to be speculative and unpersuasive.  *See* Issues & Dec. Mem. at 9 ("First,

[USM] provided non-contemporaneous financial statements for this company covering the fiscal

years 1994–1995 through 2000–2001.  None of these financial statements, except [those for]

1994–1995[,] . . . list retorts as a direct material.").

Next, "[w]ith regard to [USM's] claim that a Malaysian producer treated retorts as 'raw

materials,' the Department [found] that an individual company's treatment [was] insufficient to

show that the magnesium industry as a whole treats retorts as [a] direct material when most of

the other industry financial statements available on the record . . . did not list retorts as direct

material."  Issues & Dec. Mem. at 9.  Accordingly, it is difficult to quarrel with the Department's

conclusion that USM has presented little evidence that retorts are treated as a direct material

input by the magnesium industry.

USM next asserts that record evidence demonstrates that Company A treated retorts as a

direct input on its financials.  *See* Pl.'s Br. 29, 30.  The primary evidence relied upon by USM is

a subledger, on which the retorts are described as "materials consumption."  *See* Pl.'s Br. 29

(quoting Ex. SD-6A to Pl.'s Br. (ECF Dkt. No. 94) ("Subledger")) (internal quotation marks

omitted); *see also* Remand Results at 30.  The Department, however, notes that the subledger

also (1) included "items that would not be considered direct material inputs" as "material[s]

consumption"[10] and (2) includes "other line-items that are not material inputs."[11]  *See* Remand

Results at 30–31 (quoting Mem. from Eve Wang, International Trade Compliance Analyst, to

The File at 3, PD 29 (Part 2) (Dec. 5, 2011), ECF Dkt. No. 25) (internal quotation marks

omitted).  Thus, although, at first blush, the description "materials consumption" might indicate

that the listed items were direct inputs, an examination of the nature of the entries shows that

they are not.  As a result, Commerce determined that, despite Company A having listed retorts as

"materials consumption," the subledger does not indicate that Company A treated retorts as a

direct material.  *See* Remand Results at 30–31.

In addition, because Company A's "December 2009 monthly production cost sheet" does

not include retorts under the category of "raw material" along with other direct materials such as

dolomite and flux, Commerce concluded that the cost sheet was further evidence that Company

---

[10]      The subledger also lists items such as [[          ]] and [[          ]], and
[[          ]] is also described as "materials consumption."  *See* Subledger.

[11]      The subledger also lists non-material inputs such as [[          ]].  *See* Subledger.

A did not treat retorts as a direct material.  *See* Remand Results at 31 n.113 ("None of the

evidence presented by USM undermines the Department's original determination with respect to

retorts.  Record evidence demonstrates that [Tianjin's] producer [(Company A)] does not treat

retorts as raw material on its books and records.  [Company A's] December 2009 monthly

production cost sheet, under the category of 'raw material,' *i.e.*, direct materials, lists (1) Fesi;

(2) Dolomite; (3) Flux; (4) Fluorite Powder; (5) Sulphur Powder; and (6) Sulfuric Acid, and does

not include retorts." (quoting Letter from David A. Riggle, Riggle & Craven, to Secretary of

Commerce at 113 (Ex. D-2h), CD 3 (Part 1) (Aug. 27, 2010), ECF Dkt. No. 25)).  The foregoing

demonstrates that the Department's conclusion, that Company A did not treat retorts as a direct

material, is supported by substantial evidence.

       Aside from the evidence itself, USM also makes a claim with respect to Commerce's

current practice by arguing "that physical incorporation [is] no longer . . . *required* for a finding

that an item is a direct material."  Pl.'s Br. 37.  According to USM, Commerce is "exclusively

following its 1998 decision[12] that rested only on that factor," physical incorporation, which is

no longer its practice, and, thus, "Commerce has in effect reverted to its old practice without

accurately explaining its reasons for doing so."  Pl.'s Br. 37 (citing Remand Results at 8).  For

USM, "Commerce must consider all record evidence relevant to analysis of this issue" and "[i]t

has not done so."  Pl.'s Br. 38.

---

[12]     In the new shipper review to which USM refers, Commerce declined to treat
retorts as a direct material because they were not physically incorporated into the final product.
*See* Pl.'s Br. 17 n.24 (citing Pure Magnesium From the PRC, 63 Fed. Reg. 3,085, 3,088 (Dep't of
Commerce Jan. 21, 1998) (final results of antidumping duty new shipper administrative review)).
This new shipper review tends to support the conclusion that the Department has a past practice
of finding physical incorporation to be important in a determination of how to characterize an
input.

USM asserts that the following statement in a supplemental questionnaire issued to

Tianjin indicates that Commerce no longer requires physical incorporation to make a finding that

an item is a direct material input:

> [Tianjin] reported retort vessels as part of overhead and did not report per-unit
> FOP consumption of the material. . . . In addition, the Department has included as
> direct material inputs that are essential to production and used in significant
> quantities, *despite*[13] *such inputs not being physically incorporated into the final
> product*.

*See* Pl.'s Br. 16 (alteration in original) (quoting Letter from Eugene Degnan, Program Manager,

to David A. Riggle, Riggle & Craven at 4, PD 40 (Part 1) (Jan. 18, 2011), ECF Dkt. No. 25).

The Department maintains, though, that physical incorporation is still an important factor

that it permissibly considered in making its determination. *See* Remand Results at 31 ("Lastly,

as to USM's assertion that the draft remand results failed to acknowledge that the basis for the

1998 [characterization] of retorts, based on physical incorporation, is no longer the Department's

policy, we disagree. Although USM points to a supplemental questionnaire to argue that

'physical incorporation is no longer required for finding an item to be an indirect material,' this

does not demonstrate that the Department does not consider physical incorporation in its

analysis. Indeed, as explained above, the CIT[14] recently upheld the Department's decision in

which it considered physical incorporation whether looking at the direct versus indirect material

---

13      The presence of the word "despite," of course, undermines USM's argument.

14      In *Bridgestone Americas v. United States*, the input at issue, HO Oil was "added
in [the] milling process, for the purposes of softening rubber and improving its processing
technical function." *Bridgestone Americas, Inc. v. United States*, 34 CIT __, __, 710 F. Supp. 2d
1359, 1364 (2010) (alteration in original) (citation omitted) (internal quotation marks omitted).
The *Bridgestone Americas* Court held that Commerce's finding, that the oil was a direct input,
was supported by substantial evidence and in accordance with law because "[i]n ordinary
parlance this description characterizes an input that is physically incorporated into the finished
product." *Id.*

analysis." (citation omitted)).  It is apparent that the question, from the Department's

supplemental questionnaire, to which USM points was designed to elicit other information that

might be relevant to the issue of whether the retorts should be characterized as a direct input, not

a signal that it was abandoning its physical incorporation analysis.

Commerce is thus right in its claim that treating the retorts as an indirect material is

consistent with its past practice of characterizing materials as overhead when "they are not

physically incorporated into the final product and are replaced too infrequently to be a direct

material."  *See* Issues & Dec. Mem. at 8.  In the Issues and Decision Memorandum, Commerce

pointed to its prior determinations regarding copper wire incorporated into cans used to preserve

mushrooms and two kinds of molds—graphite and steel—used in the production of diamond

sawblades.  Commerce stated that,

> [u]nlike the copper wire in *Mushrooms/PRC AD Final* (09/14/2005) (where
> copper wire became part of the can covered by the scope of the order) or graphite
> molds in *Diamond Sawblades/PRC AD Final* (05/22/2006) (where a portion of
> the graphite mold[] was absorbed into the finished segment), retorts in this review
> are not consumed and incorporated into the final product.  Furthermore, [in
> *Diamond Sawblades/PRC AD Final* (05/22/2006),] the Department found that
> graphite molds were replaced regularly enough to represent a direct material
> rather than overhead.  In *Diamond Sawblades/PRC AD Final* (05/22/2006), the
> producer used both graphite and steel molds to produce the final product and the
> Department reached different conclusions as to whether each kind of mold was a
> direct material.  While the Department found graphite molds to be a direct
> material, it found steel molds to be overhead.  In addition to considering the fact
> that steel molds were not absorbed into the final product, the Department
> reasoned that steel molds were replaced less frequently than graphite molds. Thus,
> . . . the Department finds that retorts are more like steel molds and are considered
> overhead, than graphite molds, because retorts are not consumed into the final
> product[15] and are replaced too infrequently[16] to be a direct material.

---

15      Because there was no record evidence "that the retorts are traceable to specific
magnesium products [and USM] conceded that [the] retorts are not physically incorporated into
the final product," it was reasonable for Commerce to conclude that retorts are not physically
incorporated into the pure magnesium produced by Company A.  Issues & Dec. Mem. at 9.

Issues & Dec. Mem. at 8 (footnotes omitted) (citing Certain Preserved Mushrooms From the

PRC, 70 Fed. Reg. 54,361 (Dep't of Commerce Sept. 14, 2005) (final results and final rescission,

in part, of antidumping duty administrative review), and accompanying Issues and Decision

Memorandum at comment 15; Diamond Sawblades and Parts Thereof from the PRC, 71 Fed.

Reg. 29,303 (Dep't of Commerce May 22, 2006) (final determination of sales at less than fair

value and final partial affirmative determination of critical circumstances), and accompanying

Issues and Decision Memorandum at comment 2).  In addition, Commerce is correct that this

analysis demonstrates both (1) that the Department continues to consider physical incorporation

when making a determination as to whether an input is a direct material or not and (2) how this

consideration is used in its analysis.

The Department's thorough review of USM's claims demonstrates that they are without

merit.  Therefore, the Department's determination to treat retorts as an indirect material valued as

overhead is sustained as being supported by substantial evidence and in accordance with law.


**B.  The Untimely Submission**

Almost eleven months after the deadline, USM filed a submission of publicly available

information regarding retorts, including (1) an August 26, 2011 Chinese magnesium industry

bulletin, (2) "the website of an entity that [USM] claims is the producer of the subject

magnesium[,] and [(3)] an excerpt from a May 2006 Chinese Magnesium Industry Directory

---

[16]      Company A replaces its retorts every [[                    ]].  *See* Mem. from Eve Wang,
International Trade Compliance Analyst, to The File at 3 n.9, CD 6 (Part 2) (Dec. 5, 2011), ECF
Dkt. No. 25.

published by the Chinese Magnesium Association."[17]  *See* Submission Rejection Mem. at 2; *see also USM I*, 37 CIT at __, 895 F. Supp. 2d at 1323.  USM insists that the submission, along with other record evidence, shows (1) that Company A is the same entity as (or is very closely aligned with) Company B,[18] another manufacturer of magnesium, (2) that Company B was a producer of retorts, and (3) that Company A therefore produced, rather than rented, the retorts it used to make the subject merchandise that it supplied to Tianjin.  *See* Submission Rejection Mem. at 2; Pl.'s Br. 13, 14.  According to USM, Tianjin was required to disclose to the Department that Company B, and thus Company A, produced retorts and "[i]ts failure to do so . . . is strong evidence that fraud occurred in the underlying review."  *See* Pl.'s Br. 15.  Moreover, according to USM, this evidence is significant because a finding of fraud on the part of Tianjin would permit the Department to apply adverse facts available[19] ("AFA") to Tianjin's submissions

---

[17]     USM claimed in its Rule 56.2 brief that the "Chinese industry bulletin conclusively establish[ed] that [Company A] produced the estimated [[                    ]] retorts it is estimated to have consumed at one of its two magnesium factories during the POR" and that the website and directory corroborated the information in the bulletin.  *See* US Magnesium's Rule 56.2 Br. in Supp. of Mot. for J. on the Agency R. 7, 8 (ECF Dkt. No. 32) ("USM's 56.2 Br.") (citing Submission Rejection Mem. at 2).  According to USM, because Tianjin "had failed to report this fact and instead claimed that [Company A] rented retorts," and because this "information was dispositive of a crucial issue" (the characterization of retorts as direct or indirect material inputs), "the [(untimely)] submission demonstrated that [Tianjin] had concealed material facts in an effort to reduce its margins."  USM's 56.2 Br. 7–8.  Before the court, USM does not appear to make any specific arguments related to the documents in its untimely submission.  USM does, however, continue to argue against Commerce's general position that the documents do not pertain to Company A or show that Company A produced the retorts it used to manufacture pure magnesium.  *See* Pl.'s Br. 14.

[18]     [[                                                              ]] identity is being withheld as business-proprietary information.  All references to this company hereinafter will be to "Company B."

[19]     Pursuant to 19 U.S.C. § 1677e(b), if Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information

(footnote continued)

regarding the retorts.  *See* Pl.'s Br. 16, 21.  The Department rejected the submission as untimely

and, thus, did not consider the factual information found in the rejected documents in the Final

Results.  *See* Submission Rejection Mem. at 2.

The *USM I* Court remanded the issue of USM's untimely submission, instructing the

Department to consider whether the untimely submission should be placed on the record.  *See*

*USM I*, 37 CIT at __, 895 F. Supp. 2d at 1326.


### 1.  *Whether Fraud Existed and the Strength of the Evidence of Fraud*

Pursuant to the *USM I* Court's remand order, the Department opened the administrative

record and accepted USM's untimely submission so that it could consider whether the

documents provided *prima facie* evidence of fraud related to the relationship between Company

A and Company B and whether Company A made or rented the retorts.  *See* Remand Results at

2, 5.  In the Remand Results, the Department determined that USM's submission did not

demonstrate fraud on the part of Tianjin largely because the documents that made up the

submission did not (1) contradict or undermine Tianjin's statement that Company A rented

retorts or (2) demonstrate that Company A produced, rather than rented, retorts.  *See* Remand

Results at 24.

In reaching this determination, the Department found the USM evidence to be

unconvincing and chose to rely on what, it believed, was more reliable information on the record.

This evidence was the verification report from the 2007–2008 review and the fact of Company

A's (rather than Company B's) control of the plants that produced the pure magnesium at issue.

---

from the [Department]," Commerce "may use an inference that is adverse to the interests of that
party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).

Based on this evidence, the Department determined that Company A and Company B were separate operations, headquartered in the same building.[20]  *See* Remand Results at 24, 25, 26 (stating that, "even though both the 2007–2008 and 2008–2009 verifications of the sales and accounting activities of [Company A] took place in [Company B's] headquarters, [Commerce] treated, and continue[s] to treat, them [as] separate[] legal entities," that the 2007–2008 verification report "clearly states that the companies are separate legal entities," and that, in the 2008–2009 and 2009–2010 reviews, "the two plants that produced the subject merchandise . . . continued to be in the sole control of [Company A]").  Therefore, for the reasons given by the Department, it found that the bulletin, website, and directory provided by USM, which show that Company B made retorts, did not demonstrate that Company A made retorts or that Tianjin provided inaccurate information to the Department regarding Company A.

The Department also rejected USM's suggestion that Tianjin's failure to disclose that Company A was affiliated with Company B constituted a failure to cooperate because the questionnaire sent to Tianjin did not require it to disclose that information.  *See* Remand Results at 24, 27–28 ("Further, we disagree with USM that [Tianjin] failed its duty to report, or was even on notice of an obligation to report, the fact that its supplier [(Company A)] may have had an affiliate [(Company B)] that produces retorts. . . . [T]he . . . question directs [Tianjin], the respondent in this review, to report its affiliate producers.  In response, [Tianjin] responded that [Company A] was its unaffiliated producer.  However, the Department did not design this question to seek information regarding affiliates of non-affiliated producers[ (i.e., whether Company A was affiliated with Company B)].  Whether a non-affiliate producer has other

---

[20]     The Department also noted that neither the fax number nor address identified in the USM documents for Company B "matche[d] the fax number or address of [Company A] on the record."  *See* Remand Results at 13.

affiliates has no implication on the dumping margin calculation pertaining to the respondent if

these affiliates are not involved in the production of the subject merchandise exported by

[Tianjin], as in this review.  Record evidence also shows that [Tianjin] has no affiliation with its

supplier of subject merchandise, [Company A], in this review.  Thus, contrary to USM's claim,

[Tianjin] would have no duty to report whether its non-affiliate supplier [Company A] had an

affiliate that produced retorts." (footnotes omitted)).

   The court sustains the Department's determination "that the documents submitted by

USM do not demonstrate *prima facie* evidence of fraud by [Tianjin]."  *See* Remand Results at

31.

   First, Commerce considered the record evidence and reasonably determined that

Company A and Company B were not the same company.  *See* Remand Results at 24–25 ("The

2007–08 verification report explicitly states that [Company B] and [Company A] are 'separate

legal entities,' and 'kept distinct financial records during the [period of review].'  During that

[period of review], 'beginning in January 2008, [a] pure magnesium plant was transferred to

[Company A], at which point [Company A] became the sole producer of subject merchandise for

the remainder of the [period of review].'  The Department verified the relevant documents

recording the ownership transfer from [Company B] to [Company A].  During the subsequent

two reviews (*i.e.*, the 08–09 and 09–10 reviews), the two plants that produced the subject

merchandise . . . continued to be in the sole control of [Company A], and [Company B] was no

longer [Tianjin's] supplier of pure magnesium for those reviews.  No evidence on the record of

this review contradicts these findings. . . . As explained in the draft remand results, even though

both the 2007–2008 and 2008–2009 verifications of the sales and accounting activities of

[Company A] took place in [Company B's] headquarters, we treated, and continue to treat, them

to be separate[] legal entities." (footnotes omitted)).[21]  In other words, the Department did not

simply take Tianjin's word for the relationship between Company A and Company B; this

relationship was a subject of verifications.  Moreover, Tianjin had provided the Department with

documentation showing that it rented its retorts and, in the Remand Results, the Department

stated that it did "not find that the new record evidence demonstrates that [Company A]

produced retorts rather than rented them."  *See* Remand Results at 26, 29 ("In response to the

Department's request for [Company A's] internal documentation prepar[ed] during the normal

course of business indicating the retorts are treated as overhead, [Tianjin] provided a rental lease

of retorts as well as excerpts of Chinese accounting literature showing that rent is treated as an

indirect manufacturing expense in China.").

        Second, the Department correctly rejected USM's argument that Commerce should apply

AFA as a result of Tianjin's failure to submit information about Company B because the

questionnaire sent to Tianjin did not require it to disclose information about unaffiliated

companies that did not produce the subject magnesium.  Indeed, Question 3.a of the

questionnaire directed the respondent, here, Tianjin, to "[p]rovide an organization chart and

description of [the] company's [(Tianjin's)] operating structure," to "[d]escribe the general

organization of the company and each of its operating units," and "for all *affiliated producers of*

*the merchandise under consideration*, [to] provide information for the following table."  *See*

Remand Results at 27 (emphasis added) (quoting Letter from Eugene Degnan, Acting Program

Manager, to David A. Riggle, Riggle & Craven at A-5–A-6, PD 4 (Part 1) (June 30, 2010), ECF

---

        [21]        Moreover, Commerce also found that USM's claim that Company A "[[
                                                                        ]] finds no
support on the record. . . . In fact, the second piece of evidence proffered by USM states that
[[                              ]] specifically refers to [Company B], not [Company A]."  Remand Results at
25 (footnote omitted).

Dkt. No. 25).  Although Company B may be affiliated with Company A, there is no indication

that Tianjin was affiliated with Company A, let alone, Company B.  As such, because Company

B is not affiliated with Tianjin and is not itself a producer of the subject merchandise, Tianjin

was not required to include information about Company B in its response to the questionnaire.

Thus, Tianjin did not fail to disclose information about Company B, or Company A's

relationship with Company B, because the questionnaire did not ask for that information.

Because Commerce reasonably determined that the record evidence does not show that

the companies are so closely aligned that they should be considered one, and because Tianjin did

not fail to disclose the information that Commerce asked for in its questionnaire, Commerce's

finding that the documents do not provide evidence of fraud or warrant the application of AFA is

supported by substantial evidence.


### 2. *Level of Materiality*

In addition to finding that the evidence did not support a finding that Company A made,

rather than rented, the retorts, the Department found that, even if the reverse had been true, it

would have been immaterial to its determination that the retorts were an indirect input.  Pursuant

to the *USM I* Court's instructions, Commerce considered the level of materiality of the

information in USM's untimely submission, as well as USM's claim that Tianjin failed to

disclose Company A's affiliation with Company B, and found "that this information ha[d] no

bearing on the [characterization] of retorts as overhead in this case" and was thus not material to

its determination.  *See* Remand Results at 15, 31.  Put another way, the Department found and

the court agrees that, even if the information contained in the untimely submission had shown

that the relationship between Company A and Company B was so close that Company A could

be considered a manufacturer rather than a lessee of retorts, it simply would not have mattered.

Although USM claims that Tianjin's "failure to provide complete disclosure of its

supplier's business practices [(i.e., USM's claim that Company A produced, rather than rented,

retorts)] with respect to retorts necessarily is material to the margin calculations," this is clearly

not the case.  *See* Pl.'s Br. 26.  As Commerce indicated, whether an input is rented or produced

does not affect the Department's analysis in characterizing the input as either a direct material

input or an indirect material input valued as overhead.  Remand Results at 14–15.

There can be no real question that Commerce was correct in its finding.  As has been

previously noted, the Department was reasonable in treating the retorts as overhead.  Whether

Company A rented or produced the retorts it used, however, had no bearing on Commerce's

characterization of the retorts or on its resulting margin calculation.  Thus, Tianjin's rate would

have been the same had it disclosed a close relationship between Company A and Company B or

had Commerce found that Company A produced its retorts.  Therefore, because the court has

already sustained Commerce's characterization of the retorts as overhead, and because the

manner in which Company A acquired the retorts had no impact on that characterization (or

consequently, on Tianjin's rate), the Department's finding regarding materiality is sustained.


## IV.   TIANJIN'S ARGUMENTS

Tianjin argues that the Remand Results should be returned to Commerce for the

Department to consider the arguments made in its comments on the draft remand results with

respect to the surrogate value for truck freight and to give it an opportunity to comment on the

selection of the MALCO data as the basis for the financial ratios in the Remand Results.

### A.  Selection of the World Bank Data to Calculate the Surrogate Value for Truck Freight

In the Final Results, Commerce acknowledged that it was unclear exactly what costs were covered by the Infobanc truck freight rate data, but nonetheless concluded that it was the best available information on the record and selected the data to calculate the surrogate value for truck freight.  *See* Issues & Dec. Mem. at 16, 18.  The *USM I* Court remanded this finding because it concluded that Commerce had "erred in failing to support its selection of Infobanc rates with substantial evidence and in ignoring contradictory evidence on the record."  *USM I*, 37 CIT at __, 895 F. Supp. 2d at 1328.

Thus, on remand, Commerce was directed to "either adequately explain its rationale for selecting Infobanc data with support from substantial evidence in the record or select a new surrogate for truck freight rates."  *Id*. at __, 895 F. Supp. 2d at 1330.  In the Remand Results, the Department found that the World Bank data was the best available information, and used those rates to value inland truck freight, because it was "contemporaneous with the POR and based on country-wide information," "[t]he World Bank provides information on the source and calculation of the rates it reports," and the World Bank submission included "a detailed discussion support[ing] how the World Bank data were determined."  *See* Remand Results at 17.  Commerce also found the World Bank publication to be "reliable because it provides detailed information about its local partners with whom it works to collect the necessary information for calculat[ing] its reported rates."  Remand Results at 17.

While Tianjin asks for another remand so that Commerce might consider its argument, made in its comments on the draft remand results, that "[t]he World Bank data is aberrational and not representative of India's truck freight prices," it is apparent that the reason the

Department did not address this argument is because Tianjin misfiled its comments.[22]  *See*

Comments of Def.-Int. Tianjin Magnesium International Co., Ltd. on the Department's Remand

Determination of July 11, 2013 2 (ECF Dkt. No. 92) ("Tianjin's Br."); Public App. to Tianjin's

Br. 2 (ECF Dkt. No. 95); Oral Arg. Tr. 31:24–32:10 (ECF Dkt. No. 115); *see also* Def.'s Reply

to Comments Regarding Final Remand Results 22 (ECF Dkt. No. 106) ("Def.'s Br.").  Because

of this misfiling, Tianjin's comments concerning the calculation of truck freight were never

entered on the record of the administrative proceeding and, as a result, the Department was

unaware of them.  *See* Remand Results at 2 ("[Tianjin] did not submit comments on the draft

remand results."); *see also* Def.'s Br. 22–24.

        Although it acknowledges that it selected the wrong period of review when electronically

filing its comments,[23] Tianjin's counsel nonetheless argues that "[t]o the extent the Department

did not even consider [its] comments on the draft remand, such remand must be rejected and

returned to the Department for consideration of [Tianjin's] timely filed comments."  Tianjin's

Br. 2; *see also* Oral Arg. Tr. 31:24–32:10.  Notably, Tianjin's counsel gives no reason or

explanation as to how their misfiled comments were "timely."

        The court will not remand this case again because, first, Tianjin's counsel misfiled its

client's comments, thus preventing the Department from considering them and thereby waiving

its opportunity to be heard during the administrative process, and, second, in its arguments

---

[22]     Tianjin misfiled its comments to Commerce on the draft remand results by
selecting the incorrect period of review so that its comments were not electronically filed in the
correct location.  *See* Oral Arg. Tr. 31:24–32:10 (ECF Dkt. No. 115).

[23]     At oral argument, Tianjin's counsel stated that in filing the comments, "one of the
attorneys in [his] office when doing the electronic [indiscernible] selected, incorrectly selected
the wrong period for that electronically."  *See* Oral Arg. Tr. 32:5–32:7.  According to the
government's counsel, "when something's filed under the wrong segment, it doesn't necessarily
get to the correct Commerce employees."  Oral Arg. Tr. 33:11–33:12.

before the court,[24] Tianjin has not shown that the Department's selection of the World Bank data

was somehow wrong.

In its misfiled comments on the Department's draft remand results, which are attached to

its brief before this court as an appendix, Tianjin's entire argument is that the World Bank data

selected as a surrogate for truck freight is aberrationally high.  *See* Public App. to Tianjin's Br.

2–3.  Tianjin cites to no record evidence, however, that this is the case.

Moreover, because Commerce demonstrated in the Remand Results that the World Bank

data is "contemporaneous with the POR and based on country-wide information," and that "[t]he

World Bank provides information on the source and calculation of the rates it reports" and

"about its local partners with whom it works to collect the necessary information for

calculat[ing] its reported rates," the Department's determination that the World Bank data is the

best available information on the record for valuing truck freight is supported by substantial

evidence.  *See* Remand Results at 17–18; *see also Since Hardware (Guangzhou) Co. v. United

States*, 37 CIT __, __, 911 F. Supp. 2d 1362, 1375 (2013) ("World Bank data represent a

reputable source of information for valuing brokerage and handling because those data are

prepared by an independent organization and are based upon a survey derived from a broad

---

[24]    Tianjin's entire argument on this point in its brief before the court is as follows:
The [R]emand [R]esults presented to the Court are factually inaccurate.  In the [R]emand [R]esults by the Department it is stated at page 2 that "[Tianjin] did not submit comments on the draft remand results."

This is untrue.  [Tianjin] filed its comments on the [draft] remand results on May 13, 2013 under bar code 3135316.  The Department failed to include such comments in the record it sent forward to the Court.  To the extent the Department did not even consider [Tianjin's] comments on the draft remand, such remand must be rejected and returned to the Department for consideration of [Tianjin's] timely filed comments.

Tianjin's Br. 2 (citation omitted) (quoting Remand Results at 2).  Remarkably, Tianjin's counsel failed to alert the court in its papers that it had misfiled its comments.

number of producers."); *Dongguan Sunrise Furniture Co. v. United* States, 36 CIT __, __, 865 F.

Supp. 2d 1216, 1246 (2012) ("Commerce has consistently found the World Bank to be a reliable

source for data." (citation omitted)).  Thus, this determination is sustained.


### B.  Selection of the MALCO Data as the Basis for Financial Ratios

Rather than using the financial statements of aluminum producers Sudal Industries

Limited ("Sudal"), Bhoruka Aluminium Limited ("Bhoruka"), and Gujarat Foils Limited

("Gujarat") as it had done in the draft remand results, in the final Remand Results, the

Department selected MALCO data as the basis for financial ratios.  Remand Results at 2–3.

Tianjin, whose misfiled comments apparently supported the Department's use of the

Sudal, Bhoruka, and Gujarat financial statements in the draft remand results, argues that it "was

given no opportunity to address the Department's reasons for selecting [MALCO]" and that

Commerce's selection of the MALCO data "cannot be sustained where a party was deprived of

the opportunity to comment on the Department's determination and the facts and logic

underlying such determination."  Tianjin's Br. 2, 3 (citing Public App. to Tianjin's Br. 1–2).

Tianjin alleges that MALCO received subsidies, that the MALCO data did not overlap the POR

(i.e., that the MALCO data was non-contemporaneous with the POR), and "that the Department

improperly rejected the [financial statements of the] [a]luminum producers used in the draft

remand," i.e., those of Sudal, Bhoruka and Gujarat.  Tianjin's Br. 2–3.

The Department responds that Tianjin cites no record evidence in support of its subsidies

claim, that the contemporaneity issue was adequately addressed by Commerce in the Remand

Results, and that, thus, Commerce's selection of the MALCO data is supported by substantial

evidence.  Def.'s Br. 21–22.

As to its reasons for selecting MALCO, the Department stated in the Remand Results[25]

that it chose MALCO's financial statements because MALCO produces aluminum, which the

Department had "previously determined to be a comparable product to pure magnesium."[26]

Remand Results at 33.  Commerce also noted that, when selecting a surrogate producer, "the

Department examines how similar a proposed surrogate producer's production experience is to

the [nonmarket economy] producer's production experience."  Remand Results at 33.  Like

Company A, which produces pure magnesium, "MALCO produces only an unwrought metal

product and does not produce downstream products."  Remand Results at 33.  "Because

[Company A] manufactured primary pure magnesium instead of magnesium metal, [Commerce

found] that relying on MALCO's financial statements [was] more appropriate in these [R]emand

[R]esults than those of the three downstream aluminum producers [(Sudal, Bhoruka, and

Gujarat)], even though their production experience is somewhat similar to [Company A's]

production."  Remand Results at 34.

---

[25]    Commerce first stated that, "when selecting financial statements for the purpose
of calculating surrogate financial ratios, the Department's policy is to use data from market-
economy surrogate companies based on the specificity, contemporaneity, and quality of the
data."  Remand Results at 32.  Further, the "surrogate values for manufacturing overhead,
general expenses, and profit . . . will normally be based on publicly available information from
companies that are in the surrogate country and that produce merchandise that is identical or
comparable to the subject merchandise."  Remand Results at 32–33 (citing 19 CFR
351.408(c)(4)).  "[I]t is the Department's practice to, where appropriate, apply a three-prong test
that considers the: (1) physical characteristics; (2) end uses; and (3) production process" in
determining what constitutes "comparable merchandise."  Remand Results at 33 (internal
quotation marks omitted).

[26]    The Department cites its determinations in a new shipper review of pure
magnesium from the PRC for this proposition.  Remand Results at 33 (citing Pure Magnesium
From the PRC, 62 Fed. Reg. 55,215, 55,217 (Dep't of Commerce Oct. 23, 1997) (preliminary
results of antidumping duty new shipper administrative review); Pure Magnesium From the
PRC, 63 Fed. Reg. 3,085, 3,087 (Dep't of Commerce Jan. 21, 1998) (final results of antidumping
duty new shipper administrative review)).

Commerce recognized in the 2008–2009 review that Sudal and Gujarat's production processes were similar to a "secondary production process" that "involved melting magnesium scrap and alloys in a smelter and then solidifying the mixture in molds to make magnesium metal ingots."  Remand Results at 33.  Company A, on the other hand, uses "a primary production process," which "begins by calcining dolomite with coal and then mixing calcined dolomite with chemical compounds (*i.e.*, ferrosilicon and fluorite powder) to create metal balls, which [are] placed into a reduction furnace to produce magnesium crown that will be further refined to remove impurities."  Remand Results at 33–34.  In other words, Company A's "finished product, pure magnesium, is unwrought metal while Sudal, Bhoruka, and Gujarat begin their production with an unwrought metal and finish with a wrought metal product[]."  Remand Results at 34.  Here, after "find[ing] that Sudal, Bhoruka, and Gujarat's production experience occurs at a different level of production from [Company A]," Commerce stated that, "[i]n comparison, MALCO produced primary aluminum, which the Department has previously found to be comparable to pure magnesium."  Remand Results at 34.

Regarding contemporaneity, Commerce addressed the lack of overlap between the MALCO financial statements and the POR in the Remand Results.  *See* Remand Results at 34 ("Although MALCO's 2006–2007 financial statements [were] an additional year removed from [Tianjin's] POR, [it] nevertheless [found] MALCO's financial statements to be most appropriate in this review because MALCO [was] the only candidate for surrogate financial statements on the record that employs the same production process as the one used by [Company A].").  In other words, although not contemporaneous with the POR, the MALCO data was nonetheless the "best available information" because it was best approximated to Company A's production process.

As to its suggestion that MALCO received subsidies, Tianjin does not explain its reasoning or point to any evidence, let alone record evidence, that this is the case.  *See* Tianjin's Br. 2 (arguing that, because "the Department gave no indication in its draft results that it was going to select [MALCO], absent either a time machine or access to the oracle at Delphi, [Tianjin] would have no way of commenting on such methodology and pointing out the many defects including the existence of subsidies for [MALCO]").  Moreover, neither has the court found any evidence on the record suggesting that MALCO received subsidies.

Because the Department chose the MALCO data as the basis for financial ratios after it had reviewed comments on the draft remand results, no party had an opportunity to comment on the selection during the administrative process.  Tianjin is thus correct that it should be afforded an opportunity to dispute the choice.  Moreover, because the Department changed its selection between the draft remand results and the final Remand Results, Tianjin cannot be faulted for not exhausting its administrative remedies.  *See Jacobi Carbons*, 38 CIT at __, 992 F. Supp. 2d at 1367 ("Accordingly, because plaintiffs had no realistic opportunity to present their arguments before the Department, the court finds that plaintiffs did not fail to exhaust their administrative remedies.").

Tianjin is wrong, however, on where its argument should be made.  That is, rather than seeking a remand, Tianjin's avenue was to make its arguments before the court in this appeal. *See Tianjin Magnesium Int'l Co. v. United States*, 35 CIT __, __, Slip Op. 11-17, at 8–9 (2011) ("Furthermore, the Court of International Trade provides [Tianjin] a forum in which to challenge its AFA rate, regardless of exhaustion, in the event that Commerce unexpectedly changes its mind between the preliminary and final results." (citing *Qingdao Taifa Grp. Co. v. United States*, 33 CIT 1090, 1093, 637 F. Supp. 2d 1231, 1236 (2009))); *Qingdao*, 33 CIT at 1093, 637 F.

Supp. 2d at 1236 ("A party, however, may seek judicial review of an issue that it did not raise in

a case brief if Commerce did not address the issue until its final decision, because in such a

circumstance the party would not have had a full and fair opportunity to raise the issue at the

administrative level." (citing *LTV Steel Co. v. United States*, 21 CIT 838, 868, 985 F. Supp. 95,

120 (1997))).

Tianjin had the opportunity to make a substantive case before the court in its comments

following the Remand Results.  Tianjin did not make substantive arguments here, however, and,

to the extent it made cognizable objections, they are not sufficient to call the Department's

determination into question.  The record does not appear to contain evidence that MALCO

received subsidies and the Department adequately explained, based on record evidence, why it

chose the MALCO data even though it is not contemporaneous with the POR.  Thus, because the

court cannot find that the Department's determination was unsupported by substantial evidence,

its selection of the MALCO financial statements is sustained.


## CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the Department of Commerce's Final Results of Redetermination are

sustained.  Judgment will be entered accordingly.

Dated:          May 21, 2015
                New York, New York


                                            _____/s/ Richard K. Eaton_____
                                                   Richard K. Eaton